**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

YVONNE I. BRADLEY (YATES)      )
                                      )
              Plaintiff,        )     Civil Action No. 14-1698
                                        )
           v.                 )
                                        )     Magistrate Judge Lenihan
BRIAN MILLER, Warden, and      )
DR. DOMENICK DILIO           )
                                        )     ECF Nos. 62 & 67
              Defendants.     )

## MEMORANDUM OPINION

**LENIHAN, M.J.**

      Presently before the Court are Motions for Summary Judgement filed by Defendants Dr. Domenick Dilio (ECF No. 62) and Warden Brian Miller (ECF No. 67). For the reasons discussed below, both Motions will be granted.

FACTS

      The following facts are undisputed unless otherwise indicated and are taken from the parties' Concise Statements of Facts and Responses thereto at ECF Nos. 64, 69 and 73. The Court also relies on the exhibits attached to the parties' respective briefs where appropriate. [1]

      Plaintiff Yvonne I. Bradley (Yates) ("Plaintiff") proceeding pro se, brings this action pursuant to 42 U.S.C. § 1983 arising out of Plaintiff's incarceration at the Fayette County Prison ("FCP") between July 11, 2012 through April 2014. (ECF Nos. 64 & 73 ¶ 1.)

---

[1] Evidence used to support a motion for summary judgment must be admissible, although it is not necessary for it to be in admissible form on summary judgment. *See* Fed. R. Civ. P. 56(c) (2); *Celotex v. Catrett*, 477 U.S. 317, 324 (1986); *J.F. Feeser, Inc. v. Serv-A-Portion, Inc.*, 909 F.2d 1524, 1542 (3d Cir. 1990).

A.     <u>Facts pertaining to Dr. Dominic DiLeo</u>[2]

Upon entering FCP on July 11, 2012, Plaintiff underwent a health assessment and intake screening. (ECF Nos. 64 & 73 ¶ 2.) A document entitled "Medical History and Physical Exam" is dated July 12, 2012 and indicates that Plaintiff's neck was normal with no indication of a mass. The document also reflects, among other health assessments, Plaintiff's temperature, pulse, respirations and blood pressure. Plaintiff denies that a physical took place on that date because she only provided answers to questions asked of her. (ECF Nos. 64 & 73 ¶ 3.)

Plaintiff was housed at the Green County Jail from August 2012 until November 2012. (ECF Nos. 69 & 73 ¶ 22.)

Upon return to FCP, another document entitled "Annual History & Physical" dated July 8, 2013, includes the same information as noted above along with a result for blood glucose testing. Again, Plaintiff denies that a physical examination by Dr. DiLeo took place on that date because she only provided answers to questions asked of her. (ECF Nos. 64 & 73 ¶ 4.)

Thereafter, in September 2013, Plaintiff was committed to Torrance State Hospital and remained in that institution through December 23, 2013, when she was discharged back to FCP. (ECF Nos. 64 & 73 ¶ 5; ECF Nos. 69 & 73 ¶ 23.) When Plaintiff returned to FCP in December 2013, the women's quarters had been moved upstairs. (ECF Nos. 69 & 73 ¶ 24.)

On February 11, 2014, Plaintiff was seen by the medical unit for complaints of chest pain, headache and a lump on the left side of the neck, below the jaw. (ECF Nos. 64 & 73 ¶ 6.) According to medical notes, Plaintiff had a lump on the left side of her neck which had been ongoing for the past two months. The notes further indicate that the mass measured "2cm x 2 cm" and was non-tender. Plaintiff denies the above in part, but does not indicate any basis for

<hr>

[2] Defendant's name appears to be misspelled in the caption. The Court will use the spelling as presented by Defendant in his submissions to the Court, which is Dominic DiLeo.

the denial, nor does she include an appropriate reference to the record that might reflect her basis for partial denial.[3]  (ECF Nos. 64 & 73 ¶ 7.)

Plaintiff underwent mobile x-rays which showed a soft tissue abnormality in the left neck.  Plaintiff was prescribed an antibiotic, Cephalexin, 500 milligrams.  On that same day, Dr. DiLeo ordered a comprehensive metabolic panel and CBC.  Plaintiff also underwent an ultrasound of the left-side neck lump on February 12, 2014.  The ultrasound showed that the mass measured 2.8 centimeters at the greatest diameter and showed some vascularity.  It was recommended that the Plaintiff undergo a CT scan for further evaluation.  Plaintiff presented for a general sick call on February 18, 2014.  Dr. Dileo noted that the neck mass appeared to have decreased in size with antibiotics.  Plaintiff was ordered to undergo a CT scan of the neck on February 28, 2014.  Plaintiff admits the above in part, stating that Dr. DiLeo infers that the mass grew in two (2) weeks.  (ECF Nos. 64 & 73 ¶¶ 8-11.)

On February 28, 2014, the CT scan of Plaintiff's neck was performed at Uniontown Hospital.  The CT scan noted that the lump did not appear to invade the surrounding fat planes and appeared to be benign.  The report noted that the lump may represent a pleomorphic adenoma or an enlarged lymph node.  On April 1, 2014, Plaintiff was seen at a general sick call for a follow up with regard to the mass on her neck.  Dr. DiLeo indicated that the mass was apparently either a lymph node or a pleomorphic adenoma.  It was also noted that the left neck mass was now "1 cm x 1 cm," which was smaller than the prior evaluation.  On April 22, 2014 Plaintiff had a follow-up appointment with Dr. DiLeo in regard to the left submandibular cyst.

---

[3] The Local Rules of Court for the Western District of Pennsylvania require that a Responsive Concise Statement of Material Facts indicate the basis for the denial of any fact contained in the moving party's Concise Statement of Material Facts that is not admitted in its entirety, with appropriate reference to the record.  LCvR 56 C.1.b.  In this Court's Order at ECF No. 66, Plaintiff was informed of this requirement, and all requirements on summary judgment.

Examination of the neck showed an abnormal submandibular mass which was unchanged.  It was also noted that the Plaintiff was to be transferred to SCI-Pittsburgh, and it was recommended that she see an ENT after transfer.  Plaintiff was thereafter transferred from FCP.  Plaintiff denies the above in part, but does not indicate any basis for the denial, nor does she include an appropriate reference to the record that might reflect her basis for partial denial.  (ECF Nos. 64 & 73 ¶¶ 12-15.)

In her deposition, Plaintiff admits that she was seen and evaluated by Dr. DiLeo on several occasions; that two rounds of medication were ordered for treatment of the lump; that she received a "scan" off site at Uniontown Hospital that was ordered by Dr. DiLeo; that Dr. DiLeo followed-up with Plaintiff after the scan; that he advised her as to the condition of the lump; that she was sent out for a second round of diagnostic studies for a possible x-ray or other scan; that she was provided a diagnosis from Dr. DiLeo that the lump was benign; and that she was seen by him in April 2014 in reference to the condition of the lump, shortly before she was transferred from FCP.  (Bradley Deposition, ECF No.65-9 at 9-11.) [hereinafter "ECF No. 65-9 at __"].

Finally, the Court notes that in her Second Amended Complaint, Plaintiff avers that she "has gone through rigorous cancer treatments due to Dr. Dileo's [] proven negligence." (Second Amended Complaint, ECF No. 36 ¶ 13.) [hereinafter "ECF No. 36 ¶ __"].

B.      Facts Pertaining to Warden Brian Miller

**Facts relating to Plaintiff's Access to the Courts Claim**

Plaintiff entered FCP in July 2012 on charges relating to the fraudulent sale of a vehicle and a separate action for kidnapping.  (ECF Nos. 69 & 73 ¶ 1.)  When Plaintiff was arrested in connection with these charges, she had $5,237.00 in cash on her person.  The money was seized as evidence.  (ECF Nos. 69 & 73 ¶ 2.)

On August 13, 2012, Plaintiff sought use of the law library. The request was approved and she was permitted to use the library on August 15, 2012. Plaintiff denies this statement in part indicating that a 30 minute usage of the library in 20 months was hardly adequate. (ECF Nos. 69 & 73 ¶ 3.)

On January 22, 2013, bail was set and the criminal information was filed against Plaintiff for Theft by Deception, among other charges, in the Court of Common Pleas of Fayette County relating to the fraudulent sale of a vehicle. It was alleged, inter alia, that Plaintiff defrauded victim Paula Marie Thorpe out of about $11,000 in connection with the sale. (ECF Nos. 69 & 73 ¶ 4.)

On March 26, 2013, the Court appointed public defender Jeffrey Whiteko ("Whiteko") to represent Plaintiff in this matter until another attorney hired by Plaintiff could enter his/her appearance. (ECF No. 70-3 at 8.) On April 30, 2013, Whiteko petitioned the Court for an evaluation of Plaintiff's competency and the pretrial conference was continued. In response to Plaintiff's counsel's motion, the Court ordered that Plaintiff be evaluated at Torrance State Mental Hospital. On August 23, 2013, the Court determined that Plaintiff was not competent to stand trial and that Plaintiff was to receive inpatient treatment at Torrance. (ECF Nos. 69 & 73 ¶ 6.) Thereafter, Plaintiff was transferred to Torrance State Mental Hospital from September through December 2013. She was then transferred back to FCP and was deemed competent for trial at that time. (ECF Nos. 69 & 73 ¶ 7.)

On December 31, 2013, Paula Thorpe filed a Motion for Return of Evidence, seeking the money she gave to Plaintiff during the course of the theft. This Motion was denied without prejudice on the basis that the money was evidence in the criminal case and could be paid back as restitution. (ECF Nos. 69 & 73 ¶ 8.)

During the trial, Plaintiff was represented by the Public Defender's Office. (ECF Nos. 69 & 73 ¶ 9.) On February 5, 2014, Plaintiff was found guilty by a jury on all charges. On the claim of Theft by Deception, the jury found that Plaintiff had defrauded in the amount of $11,000. (ECF Nos. 69 & 73 ¶ 10.)

On February 13, 2014, Judge Joseph M. George, Jr. imposed sentencing on Plaintiff in relation to the conviction for Theft by Deception. Plaintiff was sentenced to make restitution in the amount of $10, 663.88 to victim Paula Marie Thorpe. (ECF Nos. 69 & 73 ¶ 11.) During sentencing, Plaintiff was represented by the Public Defender's Office. (ECF Nos. 69 & 73 ¶ 12.) The Court ordered that the amount of $5,237.00 found on Plaintiff at the time of the crime be returned to Thorpe and be considered partial restitution. Plaintiff denies this statement in part but does not indicate any basis for the denial, nor does she include an appropriate reference to the record that might reflect her basis for partial denial. (ECF Nos. 69 & 73 ¶ 13.)

Plaintiff has appealed her conviction and sentence both through post-trial motions and to the appellate court. Throughout these proceedings and currently, Plaintiff was and is represented by the Public Defender's Office. Her conviction still stands. In response to an interrogatory as to what "personal property" she allegedly lost as a result of purportedly inadequate law library access, Plaintiff indicated that she:

> asked continually to use the law-library services to prepare for case
> #112-2013 as well as the self-attempted representation of the post-
> trial motions. Plaintiff was not able to prepare informative
> motions to obtain relief and validate claims and facts relevant to
> Plaintiff's innocence. Plaintiff loss [sic] $5,327.00 to Paula
> Thorpe in Fayette Court at [the order of] Honorable Joe George."

(ECF No. 69 ¶ 15.) Plaintiff denies the above in part but does not indicate any basis for the denial, nor does she include an appropriate reference to the record that might reflect her basis for partial denial. (ECF Nos. 69 & 73 ¶¶ 14-15.)

<div align="center">**Facts Pertaining to Plaintiff's Conditions of Confinement Claims**</div>

At FCP, cells and bathrooms are cleaned by inmates. Inmates are assigned as cleaning personnel and will earn $4.50 per week for cleaning. Inmates are responsible for cleaning their own space.

Plaintiff testified that upon undergoing a medical exam during initial processing into the jail, the intake officer did not always check inmates upon arrival for lice. Plaintiff further testified that if an inmate was found to have lice, the jail staff would disinfect the area and treat the inmates with lice medication. The jail used this procedure to ensure that lice would not spread to the other inmates if one inmate was infected. Plaintiff indicated that she does not know if she ever caught lice while in the jail.

While being held in the women's quarters in the basement of FCP from July 2012 and during the beginning of her incarceration, Plaintiff described that there were at least 6 toilets available for the women inmates to use.

Plaintiff denies all the facts in the above three (3) paragraphs but does not indicate any basis for the denials, nor does she include an appropriate reference to the record that might reflect her bases for the denials. (ECF Nos. 69 & 73 ¶¶ 16-21.)

Plaintiff testified that she began staying in the upstairs housing at FCP in December 2013 and remained there until she was transferred out of FCP in April 2014. Plaintiff testified that on one occasion, while in the upstairs housing, another inmate, who was detoxing in the middle of the night, defecated in the shower while another inmate was using the toilet. The inmate was

only in the jail for an hour or two when the accident occurred. The mess in the shower was cleaned up that night.

Plaintiff also testified that she received a mattress and a small blanket upon arriving at the prison in the summer of 2012. She indicated that she received a larger blanket at some point during her stay at FCP. Plaintiff further testified that at times, she stayed in bunk beds. Plaintiff indicated that within 4 days of arriving at the jail in July 2012, she received a sheet from an inmate who was leaving the facility. She washed the sheet in the shower of the prison and hung it to dry. She used this sheet to cover the mattress. In her answers to interrogatories, Plaintiff indicated that she used this sheet for the next year and a half. During her deposition, however, she testified that a corrections officer immediately took the sheet from her upon seeing that she received the sheet from another inmate. Plaintiff denies all of the above in part, but does not indicate any bases for the partial denials, nor does she include an appropriate reference to the record that might reflect her bases for the denials. (ECF Nos. 69 & 73 ¶¶ 25-33.)

Plaintiff further testified that there were insects in the cells and that Correctional Officer Prinky would spray the cells at night with bug spray. (ECF Nos. 69 & 73 ¶¶ 34-35.)

She also testified she saw a mouse twice while housed at FCP. Plaintiff indicated that she saw a mouse in the cell area. In this instance, the women inmates were evacuated from the cells and put in the chapel so that officers could catch the mouse. In addition, Plaintiff saw a mouse on one of the cafeteria trays and the tray was sent back to the kitchen. Plaintiff denies all of the above in part, but does not indicate any bases for the partial denials, nor does she include an appropriate reference to the record that might reflect her bases for the denials. (ECF Nos. 69 & 73 ¶¶ 36-39.)

LEGAL STANDARD

Summary judgment is appropriate if, drawing all inferences in favor of the nonmoving party, the pleadings, documents, electronically stored information, depositions, answers to interrogatories and admissions on file, together with any affidavits or declarations, show "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56 (a) & (c). Summary judgment may be granted against a party who fails to adduce facts sufficient to establish the existence of any element essential to that party's case, and for which that party will bear the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The moving party bears the initial burden of identifying evidence which demonstrates the absence of a genuine issue of material fact; that is, the movant must show that the evidence of record is insufficient to carry the non- movant's burden of proof. *Id.* Once that burden has been met, the nonmoving party must set forth "specific facts showing that there is a *genuine issue for trial*" or the factual record will be taken as presented by the moving party and judgment will be entered as a matter of law. *Matsushita Elec. Indus. Corp. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting Fed. R. Civ. P. 56(e)) (emphasis added by *Matsushita* Court). An issue is genuine only "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Anderson v. Liberty-Lobby, Inc*., 477 U.S. 242, 248 (1986). In *Anderson*, the United States Supreme Court noted the following:

> [A]t the summary judgment stage the judge's function is not
> himself to weigh the evidence and determine the truth of the matter
> but to determine whether there is a genuine issue for trial. . . .
> [T]here is no issue for trial unless there is sufficient evidence
> favoring the nonmoving party for a jury to return a verdict for that
> party. If the evidence is merely colorable, or is not significantly
> probative, summary judgment may be granted.

*Id.* at 249-50 (internal citations omitted).

ANALYSIS

Section 1983 of the Civil Rights Act provides as follows:

> Every person who, under color of any statute, ordinance,
> regulation, custom, or usage of any State or Territory or the
> District of Columbia, subjects, or causes to be subjected, any
> citizen of the United States or any other person within the
> jurisdiction thereof to the deprivation of any rights, privileges, or
> immunities secured by the Constitution and laws, shall be liable to
> the party injured in an action at law, suit in equity, or other proper
> proceeding for redress . . . .

42 U.S.C. § 1983. To state a claim for relief under this provision, a plaintiff must demonstrate that the conduct in the complaint was committed by a person or entity acting under color of state law and that such conduct deprived the plaintiff of rights, privileges or immunities secured by the Constitution or the laws of the United States. *Piecknick v. Commonwealth of Pennsylvania*, 36 F.3d 1250, 1255-56 (3d Cir. 1994). Section 1983 does not create rights; it simply provides a remedy for violations of those rights created by the United States Constitution or federal law. *Kneipp v. Tedder*, 95 F.3d 1199, 1204 (3d Cir. 1996).

## Dr. Domenick DiLeo

In support of his motion for summary judgment, Dr. DiLeo argues that record evidence demonstrates that he was not deliberately indifferent to Plaintiff's medical needs. (ECF No. 63 at 8-9.) Plaintiff responds that Defendants' conduct . . . [was] reckless, callous, intentional and malicious" and that "Defendants' actions and intentional inactions have and continue to cause Plaintiff physical and emotional harm." (ECF No. 74-1 at 1.)

In *Estelle v. Gamble*, the United States Supreme Court noted that the most elementary principles underlying Eighth Amendment constitutional jurisprudence "establish the government's obligation to provide medical care for those whom it is punishing by

incarceration." 429 U.S. 97, 103 (1976).[4]  The *Estelle* Court concluded that the Eighth

Amendment prohibits the deliberate indifference to serious medical needs of prisoners.  *Id*. at

104.  The Court continued that a cause of action under § 1983 is thereby established "whether the

indifference is manifested by prison doctors in their response to the prisoner's needs or by prison

guards in intentionally denying or delaying access to medical care or intentionally interfering

with the treatment once prescribed."  *Id*. at 104-05 (footnotes omitted).

It was not until 1994, however, in *Farmer v. Brennan*, that the United States Supreme

Court clarified its meaning of the term "deliberate indifference."  511 U.S. 825 (1994).  In

*Farmer*, the Court held as follows:

> We hold instead that a prison official cannot be found liable under
> the Eighth Amendment . . . unless the official knows of and
> disregards an excessive risk to inmate health or safety; the official
> must both be aware of facts from which the inference could be
> drawn that a substantial risk of serious harm exists, and he must
> also draw the inference. . . .  But an official's failure to alleviate a
> significant risk that he should have perceived but did not, while no
> cause for commendation, cannot under our cases be condemned as
> the infliction of punishment.

*Id*. at 837-38.  The *Farmer* Court also discussed its reasoning in *Estelle*, noting that negligence in

diagnosing or treating the medical conditions of prisoners will not rise to the level of an Eighth

Amendment violation.  *Farmer*, 511 U.S. at 835 (quoting *Estelle*, 429 U.S. at 106).

Conversely, a plaintiff must also demonstrate a medical need that is objectively

---

[4] Although Plaintiff was a pretrial detainee during the majority of the relevant time period,
claims of denial of medical treatment by pretrial detainees are "evaluate[d] . . . under the Due
Process Clause of the Fourteenth Amendment, which prohibits the defendants from undertaking
acts that amount to punishment."  *Thrower v. Alvies*, 425 F. App'x 102, 104 (3d Cir. 2011)
(citing *Hubbard v. Taylor*, 399 F.3d 150, 166 (3d Cir. 2005)).  However, the Third Circuit has
held that the "Due Process Clause provides pretrial detainees with at least as much protection as
is afforded to prisoners raising denial-of-medical-treatment claims under the Eighth
Amendment."  *Id*. at 105 (citing *Natale v. Camden Cnty. Corr. Facility*, 318 F.3d 575, 581-82
(3d Cir. 2003)).

"sufficiently serious." A medical need is "serious" if it is one that has been diagnosed by a physician as mandating treatment, or one that is so obvious that even a lay person easily would recognize the necessity for a doctor's attention. *Monmouth Cnty. Corr. Inst. Inmates v. Lanzaro*, 834 F.2d 326, 347 (3d Cir. 1987), *cert. denied*, 486 U.S. 1006 (1988).

The parties do not dispute that Plaintiff's medical needs, objectively, were "sufficiently serious." The dispute arises with regard to the subjective inquiry, that is, whether Defendant Dr. DiLeo was deliberately indifferent to Plaintif's medical needs. Plaintiff has come forward with no evidence to raise a disputed issue of material fact as to whether Dr. DiLeo acted with "a sufficiently culpable state of mind." *See Montgomery v. Pinchak*, 294 F.3d 492, 499 (3d Cir. 2002) (citing *Wilson v. Seiter*, 501 U.S. 294, 298 (1991)). That is, there is no record evidence to suggest that Dr. DiLeo was subjectively aware that Plaintiff faced a "substantial risk of serious harm," and then disregarded it.

Instead, the medical records reflect that Dr. DiLeo did not become aware of a medical issue concerning Plaintiff's neck until February 11, 2014, when she first complained of the "lump in her left neck for past two months." (ECF No. 65-5 at 3.) Plaintiff had just been transferred back to FCP from Torrance State Hospital on December 23, 2013, and there is no indication in the Torrance State Hospital records that the Plaintiff complained of a lump in the neck or that a lump in the neck was assessed. (ECF No. 65-4 at 2-18.) After Dr. DiLeo became aware of the lump, he prescribed medication and ordered x-rays. Also on February 11, 2014, Dr. DiLeo ordered a comprehensive metabolic panel and CBC. The next day, Plaintiff underwent an ultrasound on the lump. (ECF No. 65-7 at 2.) The final ultra sound report recommended a CT scan. (*Id.*) On February 18, 2014 Plaintiff presented for a general sick call wherein Dr. DiLeo noted that the neck mass appeared to have decreased in size with the antibiotics. Ten (10 days)

later, however, the recommended CT scan was performed on Plaintiff's neck at Uniontown Hospital and revealed that the lump appeared to be benign. Dr. DiLeo examined Plaintiff on April 1, 2014 and noted that the mass was smaller than the prior evaluation. A follow-up appointment on April 22, 2014 showed an abnormal submandibular mass which was unchanged. Dr. DiLeo recommended that Plaintiff see an ENT after her anticipated transfer. Clearly, the summary judgment record in no way reflects that Dr. DiLeo was subjectively aware that Plaintiff faced a substantial risk of serious harm and then disregarded it.

Although Plaintiff avers that she has suffered because of Dr. DiLeo's negligence, negligence is simply not enough to impose liability pursuant to 42 U.S.C. § 1983 and a claim for deliberate indifference to the serious medical needs of prisoners. *See Farmer*, 511 U.S. at 835. That is, the fact that Dr. DiLeo did not "alleviate a significant risk" to Plaintiff which she believes he should have perceived but did not, will not make out a constitutional violation. *See Farmer*, 511 U.S. at 837-38.

Brian Miller

### **Access to the Courts**

Plaintiff's First Amendment access to the courts claim is premised upon her allegation that she "was not able to prepare for a pre-trial proceeding as she was not permitted to use the law library which resulted in loss of personal property." (ECF No. 36 ¶ 10.) In response to interrogatories, Plaintiff clarified her alleged loss of personal property as follows:

> Plaintiff asked continually to use the law-library services to prepare for case #112-2013 as well as well as the self-attempted representation of the post-trial motions. Plaintiff was not able to prepare informative motions to obtain relief and validate claims and facts relevant to Plaintiff's innocence. Plaintiff loss [sic] $5,327.00 to Paula Thorpe in Fayette Court at [sic] Honorable George.

(Plaintiff's Answers to Interrogatories and requests for Production of Documents Directed to Plaintiff, Exhibit E, ECF No. 70-5, Interrog. No. 6.)

In support of his Motion for Summary Judgment on this claim, Defendant Miller argues that because Plaintiff was represented by counsel at all material times in the underlying criminal case, whether she had access to a law library is irrelevant.  (ECF No. 68 at 4.)

Since 1977, the United States Supreme Court has recognized that inmates have a constitutional right of access to the courts.  *Bounds v. Smith*, 430 U.S. 817 (1977).  As the Supreme Court initially observed, this right of access to the courts is satisfied when corrections officials facilitate "meaningful" access for those incarcerated, either through legal materials or the assistance of those trained in the law.  *Id.* at 827 ("[T]he fundamental constitutional right of access to the courts requires prison authorities to assist inmates in the preparation and filing or meaning legal papers by providing prisoners with adequate law libraries or adequate assistance from persons trained in the law.").  Two decades later, in 1996, the Supreme Court provided further definition and guidance regarding the scope and nature of this right of access to the courts in *Lewis v. Casey*, 518 U.S. 343 (1996).  In *Lewis*, the Court eschewed efforts to define this right in abstract, or theoretical terms, but rather cautioned courts to focus on concrete outcomes when assessing such claims.  As the court observed:

> Because *Bounds* did not create an abstract, freestanding right to a law library or legal assistance, an inmate cannot establish relevant actual injury simply by establishing that his prison's . . . legal assistance program is subpar in some theoretical sense . . . . Insofar as the right vindicated by *Bounds* is concerned, "meaningful access to the courts is the touchstone," *id.*, at 823, 97 S. Ct., at 1495 (internal quotation marks omitted), and the inmate therefore must go one step further and demonstrate that the alleged shortcomings in the . . . legal assistance program hindered his efforts to pursue a legal claim.  Although *Bounds* itself made no mention of an actual-injury requirement, it can hardly be thought to have eliminated that constitutional prerequisite.  And actual

> injury is apparent on the face of almost all the opinions in the 35-year line of access-to-courts cases on which *Bounds* relied, *see id.*, at 821-825, 97 S. Ct., at 1494-1497. Moreover, the assumption of an actual-injury requirement seems to us implicit in the opinion's statement that "we encourage local experimentation" in various methods of assuring access to the courts. *Id.*, at 832, 97 S. Ct., at 1500.

*Lewis*, 518 U.S. at 351-52.

Thus, following *Lewis*, courts have consistently recognized two guiding principles which animate access-to-court claims by prisoners. First, such claims require some proof of an actual, concrete injury, in the form of direct prejudice to the plaintiff in the pursuit of some legal claim. *See, e.g.*, *Oliver v. Fauver*, 118 F.3d 175 (3d Cir. 1997); *Demeter v Buskirk*, No. 03-1005, 2003 WL 22139780 (E.D. Pa. Aug. 27, 2003); *Castro v. Chesney*, No. 97-4983, 1998 WL 150961 (E.D. Pa. March 31, 1998). Second, consistent with the Supreme Court's express view that "'we encourage local experimentation' in various methods of assuring access to the courts," *Lewis*, 518 U.S. at 352, courts have long recognized that public officials have significant discretion in the field and can provide meaningful access to the courts through a wide variety of means. *See, e.g.*, *Peterkin v. Jeffes*, 855 F.2d 1021, 1042 (3d Cir. 1988) (construing "*Bounds* to hold that the provision of lawyers is one means by which a state may provide prisoners with meaningful access to the courts); *Hester v. Morgan*, No. 10-309, 2010 WL 3907770, *3 (D. Del. Sept. 29, 2010) ("The fact that Plaintiff has appointed counsel belies his claim that he is denied meaningful access to the courts."); *Tinsley v. Del Rosso*, No. 08-1251, 2008 WL 2236598 (D. N.J. May 30, 2008) (same) (collecting cases); *Annis v. Fayette County Jail*, No. 07-1628, 2008 WL 763735, *2 (W.D. Pa. March 20, 2008) (once plaintiff given counsel, total denial of access to law library will not constitute denial of access to courts) (citing *Rogers v. Thomas*, No. 94-

4692, 1995 WL 70548, at *2 (E.D. Pa. Feb. 17, 1995), *aff'd*, 65 F.3d 165 (3d Cir. 1995) (Table));

*Hunter v. Schouppe*, No. 06-1023, 2007 WL 120030 (W.D. Pa. Jan. 10, 2007) (same).

Here, Plaintiff's claim fails as a matter of law because the record reflects that she was provided with counsel during pretrial, jury trial, and sentencing proceedings in the underlying criminal action where she was ordered to make restitution. *See* Court of Common Pleas of Fayette County Docket Sheet, CP-26-CR-0000112-2013, Exhibit C, ECF No. 70-3 at 1-24 [hereinafter "ECF No. 70-3 at __"]. That is, a state can fully discharge its obligation to provide a prisoner with access to the courts by appointing counsel. *Lindsey v. Shaffer*, 411 F. App'x 466, 469 (3d Cir. 2011) (citing *Peterkin*, 855 F.2d at 1042).[5]

For the reasons discussed above, Defendant Miller's Motion for Summary Judgment on Plaintiff's First Amendment access to the courts claim will be granted.

### Conditions of Confinement

As to Defendant Miller, Plaintiff's remaining claims concern conditions of confinement. Specifically, Plaintiff was allegedly "plagued by lice twice, exposed to tuberculosis, as well as continual rashes due to the overcrowding in quarters alongside residents who weren't cleared for general population." (ECF No. 36 ¶ 8.) Plaintiff further avers that she "utilized newspaper as bedding until another inmate was released, at which time Plaintiff washed a sheet as clean linen was not provided." (ECF No. 36 ¶ 9.) Plaintiff also alleges that she "was constantly at war with cockroaches." (ECF No. 36 ¶ 14.) Finally, Plaintiff claims that she "waited almost 4 hours to use the bathroom because the only one that was available to the 30-40 women was defiled by a

---

[5] Of course, Plaintiff's claim for denial of access to the courts is barred by the doctrine of *Heck v. Humphrey*, 512 U.S. 477, 486-87 (1994) (damages remedy that necessarily implies the invalidity of a criminal conviction is impermissible while that conviction stands).

resident who was 'detoxing' and was in the process of vomiting and defecating."  (ECF No. 36 ¶ 12.)

Because Plaintiff was a pretrial detainee during the majority of the time relevant to her conditions of confinement claims, the Court will analyze her claims under the Due Process Clause of the Fourteenth Amendment.  *Hubbard v. Taylor*, 399 F.3d 150 (3d Cir. 2005) (*Hubbard I*).  "Under the Fourteenth Amendment, when a pretrial detainee complains about the conditions of his confinement, courts are to consider whether the conditions 'amount to punishment prior to an adjudication of guilt in accordance with law.'"  *Mohorcic v. Hogue*, No. CIV. A. 11-575, 2013 WL 6118693, at *2 (W.D. Pa. Nov. 21, 2013) (citing *Hubbard I* at 158). In making such a determination, the court must ask (1) whether any legitimate purposes are served by the conditions at issue, and (2) whether those conditions are rationally related to those purposes.  *Hubbard v. Taylor*, 538 F.3d 229, 232 (3d Cir. 2008) (*Hubbard II*) (quoting *Union County Jail Inmates v. Pi Buono*, 713 F.2d 984, 992 (3d Cir. 1983)).  If a particular condition of pretrial detention is "reasonably related to a legitimate government objective, it does not, without more, amount to punishment."  *Bell v. Wolfish*, 441 U.S. 520, 539 (1979).  If a condition is arbitrary or purposeless, and thus not reasonably related to a legitimate goal, a court may infer its purpose is punishment.  *Id.*

The summary judgment record fails to support a conditions of confinement claim based upon the existence of pests or rodents.  While unsanitary living conditions may give rise to a conditions of confinement claim, the conditions described here do not rise to a level that is constitutionally impermissible.  *See Thomas v. SCI-Graterford,* Civil Action No. 11-6799, 2014 WL 550555, at *4 (E.D. Pa. Feb. 12, 2014) (holding exposure to mice, insects and mold in a cell for two weeks was not a constitutionally impermissible condition); *Hill v. Smith*, No. 4:05-CV-

1724, 2005 WL 2666597, at *7 (M.D. Pa. Oct. 19, 2005) (holding that the presence of mice and cockroaches, while uncomfortable, did not pose a serious health risk to the plaintiff and did not by themselves articulate an unconstitutional situation). Plaintiff has failed to allege or come forward with evidence that these conditions jeopardized or potentially jeopardized her health. *See Mitchell v. Dodrill*, 696 F. Supp.2d 454, 467 (M.D. Pa. 2010). The prison sprayed for pests, and responded quickly to catch mice when they were spotted by inmates. (ECF No. 65-9 at 38-39.) Similarly, any alleged presence of mold in the cells does not give rise to a constitutional violation where no health problems have been alleged as a result of the mold. (*Id.* at 43.)

Likewise, Plaintiff's complaints about her lack of a bed sheet do not rise to the level of a constitutional violation. Plaintiff alleges that she was not issued clean linen upon entry to FCP, and was forced to utilize newspaper as bedding. (ECF No. 36 ¶ 9.) Plaintiff, however, gave differing statements in her deposition and answers to interrogatories. In deposition, Plaintiff testified that she received half a blanket, and two days later, a sheet from another inmate that she washed and used until it was taken from her by a prison official who saw that she had a sheet after just arriving at FCP in July 2012. Eventually she traded her half-blanket for a full size blanket when another inmate left. (ECF No. 65-9 at 36-37.) In response to interrogatories, Plaintiff indicated that she waited 4 to 6 days for a sheet from another inmate that Plaintiff washed and used for the next year and a half. (Exhibit E, ECF No. 70-5 at 4.) In either event, while admittedly not ideal, the denial of a sheet for a short period of time does not rise to the level of a constitutional violation. *See Gutridge v. Chesney,* No. CIV. A. 97-3441, 1998 WL 248913, at * 1 (E.D. Pa. May 8, 1998) (failure to provide blanket for a month and a half from mid-April until early June was not constitutional violation); *Lane v. Culp*, Civil Action No. 05-576, 2007 WL 954101, at *5 (W.D. Pa. Mar. 28, 2007) (denial of bedding for a period of 7 days

does not rise to the level of a constitutional violation). Plaintiff comes forward with no evidence that she was harmed as a result of her complaints regarding bedding.

The Court also finds that Plaintiff has failed to raise a genuine issue of fact as to her bathroom access claim. Plaintiff complains that she once "waited almost 4 hours to use the bathroom because the only one that was available to the 30-40 women was defiled by a resident who was 'detoxing.'" (ECF No. 36 ¶ 12.) The conditions that Plaintiff describes do not appear to be "particularly dehumanizing," result in unsanitary conditions, or endanger the health of residents so as to mark unconstitutional conditions. *See Lindsey v. Shaffer*, 411 F. App'x 466, 468 (3d Cir. 2011). Instead, Plaintiff testified that there were at least 6 toilets when the women's quarters were in their original location in the lower level of FCP. (ECF No. 65-9 at 21.) When she returned to FCP from Torrance State Hospital, women were held for a period of time in the upstairs of the jail. Plaintiff comes forward with no evidence that she was harmed as a result of her complaints regarding bathroom access. In fact, the particular incident involving a detoxing inmate was not caused by Defendant and was resolved that same evening. An isolated incident and sharing of facilities will not give rise to a constitutional violation. *See Lindsey*, 411 F. App'x at 468 (one toilet shared by all inmates in unit did not harm prisoner and did not rise to constitutional violation).

Finally, Plaintiff fails to come forward with any evidence that she was "plagued by lice twice, exposed to tuberculosis, as well as continual rashes due to the overcrowding in quarters alongside residents who weren't cleared for general population." (ECF No. 36 ¶ 8.) Plaintiff comes forward with no evidence that another inmate had tuberculosis, testifying only that the inmate was "coughing all over the place." (ECF No. 65-9 at 141-42.) Plaintiff did not contract tuberculosis while in jail or after she left FCP in April 2014. Similarly, jail records do not reflect

that Plaintiff was infested with lice. Instead, contrary to her allegations in the Second Amended Complaint, Plaintiff testified that she does not know if she ever caught lice while in FCP. (ECF No. 65-9 at 142.) Plaintiff further testified that if an inmate was found to have lice, the jail staff would take measures to address the problem with medication and cleaning. (ECF No. 65-9 at 142.) Most importantly, Plaintiff testified that inmates would be housed before being medically cleared only on isolated occasions when medical was not on site in the middle of the night. (ECF No. 65-9 at 37.) Plaintiff comes forward with no evidence that the practice or custom at FCP was to provide no medical screening of incoming inmates by medical personnel.[6] Contrary to Plaintiff's allegations, and considering the totality of circumstances within FCP, the record reflects that the complained of conditions reflect no intent to punish by FCP. *See Ramsier v. Allegheny County*, Civil Action No. 15-539, 2016 WL 890603, at *4-5 (W.D. Pa. Mar. 9, 2016) (citing *Stevenson v. Carroll*, 495 F.3d 62, 68 (3d Cir. 2007)). Therefore, judgment as a matter of law is appropriate on this issue.

Viewing the record in a light most favorable to Plaintiff, the Court concludes that Plaintiff has failed to come forward with evidence to raise a genuine issue of fact that the conditions alleged by Plaintiff amounted to punishment prior to adjudication of guilt. The conditions suffered by Plaintiff, while uncomfortable, do not constitute a violation of due process under the Fourteenth Amendment. Therefore, the Court will grant Defendant Miller's Motion for Summary Judgment on Plaintiff's conditions of confinement claims.

---

[6] *But see Lareau v. Manson*, 651 F.2d 96, 102, 109 (2d Cir. 1981) (practice of providing no screening of any incoming inmates by medical personnel violated constitutional rights of pretrial detainees and convicted prisoners).

**<u>Personal Involvement</u>**

Finally, the record reflects that Plaintiff attempts to hold Warden Miller liable on the basis of the doctrine of respondeat superior. Plaintiff testified that she never spoke with Defendant Miller and it appears that she seeks to hold him liable because he was in charge of FCP. (ECF No. 65-9 at 34.) The law is clear, however, that "'[an] individual government defendant in a civil rights action must have personal involvement in the alleged wrongdoing; liability cannot be predicated solely on the operation of respondeat superior. Personal involvement can be shown through allegations of personal direction or of actual knowledge and acquiescence.'" *Evancho v. Fisher*, 423 F.3d 347, 353 (3d Cir. 2005) (quoting *Rode v. Dellarciprete*, 845 F.2d 1195, 1207 (3d Cir. 1988)). The Court could uncover no references to Defendant Miller in the summary judgment record other than the deposition excerpt referenced above, and Plaintiff has directed the Court to none. Without more, Plaintiff has failed to raise a genuine issue of material fact as to the personal involvement of Defendant Miller "in the alleged wrongdoing." *See Evancho*, 423 F.3d at 353. Therefore, Defendant Miller's Motion for Summary Judgment will be granted on this basis as well.

<u>CONCLUSION</u>

For the reasons discussed above, the Motions for Summary Judgement filed by

Defendants Dr. Domenick Dilio (ECF No. 62) and Warden Brian Miller (ECF No. 67) will be

granted.


An appropriate Order will follow.

Dated:  January 23, 2017

<div align="center">BY THE COURT</div>




<div style="margin-left:50%"><u>s/ Lisa Pupo Lenihan</u><br>
LISA PUPO LENIHAN<br>
United States Magistrate Judge</div>


cc:    Yvonne I. Bradley (Yates)<br>
       OY 1131<br>
       SCI Cambridge Springs<br>
       451 Fullerton Avenue<br>
       Cambridge Springs, PA  16403


       All counsel of record<br>
       Via electronic filing